ADDENDUM to OPINION—*See* n. 10

Marcus MILLS, Plaintiff,

v.

The State of IOWA; James Bryant; The Stolar Partnership, LLP; and Sally Mason, Bonnie Campbell, and Douglas True, in their official and individual capacities, Defendants.

No. 3:10–cv–112.

United States District Court, S.D. Iowa, Davenport Division.

Oct. 3, 2012.

Kelly R. Baier, Bradley & Riley, Cedar Rapids, IA, for Plaintiff.

Megan R. Dimitt, Gregory M. Lederer, Megan R. Dimitt, Lederer Weston Craig PLC, Diane Kutzko, Mark L. Zaiger, Shuttleworth & Ingersoll, Cedar Rapids, IA, for Defendants.

## ORDER

ROBERT W. PRATT, District Judge.

Before the Court are the following motions: 1) a Motion for Summary Judgment, filed by Defendants Sally Mason ("Mason"), Bonnie Campbell ("Campbell"), and Douglas True ("True") (Clerk's No. 48); 2) a Motion for Summary Judgment filed by Defendant State of Iowa (the "State") (Clerk's No. 49); and 3) a Motion for Partial Summary Judgment filed by Marcus Mills ("Mills" or "Plaintiff") (Clerk's No. 72). Mills filed a resistance to the Motions filed by Mason, Campbell, and True (the "Individual Defendants"), and also to the Motion filed by the State (collectively "Defendants"), and Defendants replied. Clerk's Nos. 64–66 (Pl.'s resistance documents); 82 (State's Reply); 83 (Individual Defs.' Reply). The State filed a resistance to Mills' Motion (Clerk's No. 85), and Mills replied (Clerk's No. 91). A hearing was held on August 3, 2012

(Clerk's No. 103), and the matters are fully submitted.

## I. FACTUAL BACKGROUND

Mills began halftime employment with the University of Iowa (the "University") in approximately July 1991, and became a full-time employee with the University in the summer or fall of 1992. Pl.'s Resp. to Defs.' Joint Statement of Material Undisputed Facts ("Pl.'s Fact Resp.") (Clerk's No. 65–2) ¶¶ 1–2.[1] During this time, Mills became a member of the Professional Scientific staff of the University with career status, meaning, among other things, that Mills could only be terminated from his position for "just cause."[2] *Id.* ¶ 3.

On July 26, 2005, then-University president David Skorton ("Skorton") sent Plaintiff a letter offering him the position of "General Counsel" at the University commencing August 1, 2005. Pl.'s Resistance App. (Clerk's No. 66) at 47. Among other things, Skorton's letter stated that the annual salary would be $190,000, and that:

> In accordance with long-standing University policy, this position is classified as "at will" status. The administrative, policy-making and other responsibilities of this position required this designation. This is consistent with other upper-level executives at the University. This designation means that you serve at the will of the institution and are not guaranteed a specific term of appointment.

*Id.* at 47–48. According to Mills, he and Skorton spoke about possible revisions to the July 26 letter because "Mills had concerns that he was giving up a position that

---

1. Defendants' Joint Statement of Material Undisputed Facts actually appears at Clerk's No. 48–1. Because Plaintiff's Response to this document restates each individual asserted fact, along with Plaintiff's response, the Court will cite predominantly to the Plaintiff's Response for convenience.

2. In this position, Mills considered employment matters his area of expertise, though he also worked on a variety of non-employment matters. Pl.'s Fact Resp. ¶ 4.

had career status protections." Defs.' Joint Resp. to Pl.'s Statement of Add'l Material Facts ("Defs.' Resp. to Pl.'s Add'l Facts") ¶ 2 (Clerk's Nos. 82–1, 83–1).[3] Thus, on July 28, 2005, Skorton sent Mills a revised letter. Defs.' J.A. (Clerk's Nos. 48–2–48–3) at 221. Though the July 28 version of the letter was largely identical to the July 26 version, the July 28 letter raised the proposed salary to $197,000 per year and added the sentence, "It is my intention that you would serve for an initial term of not less than five years" after the "at-will" paragraph recited above. Id. Both letters included language indicating that the offer was "contingent on Board of Regents, State of Iowa approval and on successful completion of credential verification and of a criminal background check."[4] Id. at 222; Pl.'s Resistance App. at 48.

On July 29, 2005, Mills accepted the General Counsel position offered in Skorton's letters and, upon fulfillment of the identified contingencies, became the Vice President for Legal Affairs and General Counsel of the University in August 2005. Defs.' Resp. to Pl.'s Add'l Facts ¶ 4; Pl.'s Fact Resp. ¶ 5. As General Counsel, Mills had the duty to represent the University, its executive officers, the administration, faculty, and staff, all in their official capacities. Pl.'s Fact Resp. ¶ 12. Mills was also "directly accountable to the President for the execution of the responsibilities assigned to [him] by the President." Id. ¶ 13 (quoting Univ. Operations Manual ¶ 2.5). Skorton left the University in the summer of 2006. Id. ¶ 8. Gary Fethke served as the University's interim president until August 2007, at which time Mason became the 20th president of the University. Id. ¶¶ 8, 14.

On the morning of October 14, 2007, a female student athlete (the "Student Athlete") was sexually assaulted in her dormitory room on campus by two members of the University's football team (the "incident"). Id. ¶ 21; Defs.' Resp. to Pl.'s Add'l Facts ¶ 6. The University of Iowa Athletics Department initially received notice of the assault, and Mason and Mills, among others, were informed of the incident on October 15, 2007. Defs.' Resp. to Pl.'s Add'l Facts ¶ 6; Pl.'s Fact Resp. ¶ 22. Specifically, Mills learned of the incident in a phone call from Fred Mims ("Mims").[5] Pl.'s Fact Resp. ¶ 22. On October 23, 2007, the Department of Athletics, which had been investigating the incident, delivered its report to Mills, Phillip Jones ("Jones"), and Marcella David ("David").[6] Id. ¶ 23. The investigation was thereafter turned over to the Equal Opportunity and Diversity ("EOD") division of the University, which began conducting a formal investigation. Id. The EOD completed its in-

---

3. Plaintiff's Statement of Additional Material Facts appears at Clerk's No. 64–2. Because Defendants' Joint Response to this document restates each individual asserted fact, along with Defendants' response, the Court will cite predominantly to the Defendants' Joint Response for convenience.

4. Mills characterizes both versions of the letter as either an offer of or as constituting "a written employment contract." Defs.' Resp. to Pl.'s Add'l Facts ¶¶ 1 ("On July 26, 2005, [Skorton] Offered Marcus Mills a written employment contract."), 4 ("Mills signed the revised offer from [Skorton] on July 29, 2005. Mills' written employment contract providing that he would serve for an initial term of not less than fiver years was approved by the Iowa Board of Regents.").

5. The parties identify Mims as the University's Director of Athletics. See Pl.'s Fact Resp. ¶ 22. It appears, however, that Mims is actually the University's Associate Director of Athletics for Athletic Student Service and Compliance. See J.A. at 160.

6. David was the Special Assistant to the President for Equal Opportunity and Diversity at the University. Pl.'s Fact Resp. ¶ 23. Jones was the Director of Student Affairs. Id. ¶ 28.

vestigation on November 5, 2007. *Id.* ¶ 24. On the same date, the Student Athlete filed a criminal report of the incident with the University's Department of Public Safety ("DPS") due to harassment by members of the football team and other student athletes.[7] *Id.* ¶ 25.

On October 24, 2007, at the request of Betsy Altmaier ("Altmaier"), the Faculty Athletic Representative to the Big Ten Conference and the NCAA, Mills spoke with the Student Athlete's father.[8] *Id.* ¶ 26. Between approximately October 24, 2007 and November 13, 2007, Mills had six separate phone calls with the Student Athlete's father.[9] *Id.* ¶ 27. Moreover, from the time Mills learned of the incident through June 2008, Mills had numerous phone calls and meetings with various University staff members concerning the University's response to the Student Athlete's sexual assault, including Mims, Chuck Green ("Green"), Gary Barta ("Barta"), Marc Long ("Long"), Jones,[10] Altmaier, and Steve Parrott ("Parrott").[11] *Id.* ¶ 28. Mills also spoke with various other individuals related to the incident [12] and

was involved in preparing press releases concerning the University's response, including one in December of 2007. *Id.*

On November 15, 2007, the EOD completed a formal written report of its findings. *Id.* ¶ 29. One day prior, the Johnson County Attorney's Office had issued a subpoena for the EOD report, which contained the following confidentiality language: "IT IS FURTHER ORDERED that issuance of this subpoena shall not be disclosed to anyone, including the subscriber of the named records, excepting those who are responsible for gathering the named records and that this condition shall apply for a period of (90) ninety days." *Id.* ¶ 30.

On November 16, 2007, Mills learned that the Board of Regents (the "Board") and its counsel, Tom Evans ("Evans"), at the request of Michael Gartner ("Gartner"),[13] intended to conduct an investigation of the incident and the University's handling of it.[14] *Id.* ¶ 33. Specifically, Gartner sent an email on November 16, 2007 announcing that Evans and Andy

---

**7.** The Iowa City Police Department and the Iowa Department of Criminal Investigation also became involved after the Student Athlete made the report to DPS. Pl.'s Fact Resp. ¶ 25.

**8.** Altmaier specifically asked Mills to contact the father of the Student Athlete to answer his questions regarding the University's policies and procedures. Defs.' Resp. to Pl.'s Add'l Facts ¶ 9.

**9.** Mills provides his recollection of the substance of calls with the Student Athlete's father on October 24 and 31, and on November 5, 7, 9, and 13, 2007 in his Statement of Additional Material Facts. *See* Defs.' Resp. to Pl.'s Add'l Facts ¶ 10.

**10.** Mills denies having had communications with Jones. Pl.'s Fact Resp. ¶ 28.

**11.** Green was the University's Director of Public Safety. Pl.'s Fact Resp. ¶ 28. Barta was the University's Director of Athletics. *Id.*

Long was the Student Athlete's swim team coach. *Id.* Parrott was the University's Director of communications. *Id.*

**12.** In particular, Mills spoke with Jerry Moore, the lawyer for one of the football players; Janet Lyness, the Johnson County Attorney; and Tom Miller, the Iowa Attorney General. Pl.'s Fact Resp. ¶ 28.

**13.** At the time, Gartner was the President of the Board of Regents. Pl.'s Fact Resp. ¶ 34.

**14.** Mills emphasizes that Evans was "preparing a report, not conducting an investigation." Pl.'s Fact Resp. ¶¶ 33–34, 43. Regardless of how Evans' role is characterized, there is no doubt that Mills was aware that Evans was going to issue a report on whether the University had followed its policies and procedures. *Id.* ¶ 36.

Baumert ("Baumert")[15] would prepare for the Board "a look at the policies and processes involved in the alleged sexual assault at the University." *Id.* ¶ 35. Included in Gartner's email was a request for a timetable of what occurred between October 14 and November 6, 2007, the date Gartner believed that the DPS, the Iowa City Police Department ("ICPD"), and the Iowa Department of Criminal Investigation ("IDCI") became involved.[16] *Id.* On November 21, 2007, Mills received a copy of a November 19, 2007 letter written by the Student Athlete's parents that was critical of both Mills and of the University's handling of the incident.[17] *Id.* ¶ 32.

Mills served as Evans' "on campus contact," helping Evans gather documents and

line up witnesses.[18] *Id.* ¶ 43. Mills also attended some of Evans' interviews, as did other lawyers from the General Counsel's office, and discussed the Student Athlete incident with David Miles ("Miles")[19] on January 9, 2008. *Id.* ¶¶ 43–44. On June 11, 2008, Evans issued a report to the Board which concluded that the University had "fully complied" with internal procedural requirements, had offered the Student Athlete appropriate accommodation, and had expressed full support for the Student Athlete.[20] *Id.* ¶¶ 45–46.

Although the reasons why are in controversy, there is no dispute that Mills did not turn over the November 19, 2007 letter from the Student Athlete's parents to the Board in connection with Evans' investigation.[21] *Id.* ¶ 37; Defs.' J.A. at 26 (Q: "You

15. At the time, Baumert was the acting director of the Board of Regents. Pl.'s Fact Resp. ¶ 35.

16. Gartner sent the email to Mason, who forwarded it to Plaintiff and others. Defs.' Resp. to Pl.'s Add'l Facts ¶¶ 11–12. Mason also sent a second email to Mills and others stating that she had "just spoke[n] with [Gartner]. He does not want any names included in this, only process and time line." *Id.* ¶ 12; Defs.' J.A. at 203.

17. Mills notes that the November 19, 2007 letter was not addressed to him; rather, Green sent the letter to Mills. Pl.'s Fact Resp. ¶ 31. Mills also notes that other University officials, including Parrott, True, Mason, and Jones also received the letter, and that the letter was critical of at least four other University officials. *Id.* ¶¶ 31–32; Defs.' Resp. to Pl.'s Add'l Facts ¶ 19. Initially, Green informed the various University officials that the Student Athlete's mother was planning to send the letter to the Board and possibly to the Governor. Defs.' Resp. to Pl.'s Add'l Facts ¶ 19. On November 26, 2007, however, Green informed Mills that the Student Athlete's father had told him that the family had decided not to send the letter to the Board or to the Governor. *Id.* ¶ 20.

18. Evans initially sought information from Mills about the timeline of events thus far on November 19, 2007. Defs.' Resp. to Pl.'s Add'l Facts ¶ 13. Mills informed Evans at

that time that he believed the November 14, 2007 order of the Iowa District Court for Johnson County precluded the release of information regarding the alleged assault not only to third parties, but within the University itself. *Id.* ¶ 14. Thus, Mills told Evans that he was not providing documents specifically related to the alleged sexual assault incident and related investigation at that time. *Id.* ¶ 16.

19. On January 9, 2008, Miles was the new President of the Board of Regents. Pl.'s Fact Resp. ¶ 44. Mills contends his conversation with Miles was narrow and focused on the County Attorney, records, and media coverage. *Id.*

20. Defendants contend that "Mills had participated in drafting the factual portion of Evans' report." Pl.'s Fact Resp. ¶ 45. Mills, however, denies that he "did more tha[n] suggest corrections of fact." *Id.* Mills also points out that, in preparing his report, Evans did not speak with Mason, the Student Athlete, or the parents of the Student Athlete, though Evans' report does not mention this fact. Defs.' Resp. to Pl.'s Add'l Facts ¶ 21.

21. Although he concedes that he would have wanted the November 19, 2007 letter if he were a member of the Board, Mills maintains that did not have an obligation to turn the letter over to Evans and that several reasons

took no action to give or to cause anyone else to give [the November 19, 2007 letter] to Tom Evans, correct?" Mills: "Correct."). There is also no dispute that Mills did not turn over to Evans or the Board a second, May 16, 2008 letter from the Student Athlete's parents to University officials that expressed in great detail their dissatisfaction with the University's response to the Student Athlete's sexual assault.[22] Pl.'s Fact Resp. ¶ 42. Thus, these letters were neither discussed nor considered in Evans' June 11, 2008 report. On July 19 and 21, 2008, letters written by the Student Athlete's parents were made public. Defs.' Resp. to Pl.'s Add'l Facts ¶ 22. The letters were highly critical of the University's handling of the sexual assault incident. *Id.* In this same time period, Mills notified Evans of the existence of the November 19, 2007 letter and the May 16,

2008 letter from the Student Athlete's family. Pl.'s Fact Resp. ¶ 47. On July 18, 2008, the University issued a statement in response to the Student Athlete's mother's letter to the Iowa City Press Citizen. *Id.* ¶ 48.

At a regularly-scheduled Board of Regents meeting on July 22, 2008, Miles announced that the Board had established an Advisory Committee, chaired by Campbell,[23] to reopen the investigation. *Id.* ¶ 49. The Advisory Committee was empowered to hire outside counsel as needed to assist in the investigation of the facts. *Id.* Part of the Advisory Committee's specific charge was to "examine the circumstances around the decision not to disclose to the Board of Regents the existence of the November and May letters, how the decision was made, and on what basis." *Id.* ¶ 50. At this same Board meeting,

existed for not turning the letter over. Pl.'s Fact Resp. ¶¶ 39–42; Defs.' J.A. at 25 (Mills testifying in deposition that he understood the letter "to be a criticism of the way the people who are identified in this letter had interacted with [the Student Athlete's] family" and that "I wasn't the one in charge of the letter and determining, give it to them or not give it to them, okay? [S]everal other people had the letter and Tom Evans spoke to several other people. So I didn't—it wasn't my job as the general counsel to determine what to give to Tom and what not to give to Tom ... this was not something to my mind that was in the course of Tom's investigation, it wasn't my obligation to turn it over. And I don't—it didn't fall within the scope of looking—to my mind, to looking at the policies and procedures of whether or not the University had followed it."); Defs.' J.A. at 27 (Q: "And so, again, trying to put all of the reasons why you did not give [the November 19, 2007] letter to Tom Evans or the Board of Regents or cause anyone else to give it to them, there are now three reasons. Number one, you did not believe it was relevant to the inquiry by the Board of Regents and Tom Evans. Number two, you had concerns that the family didn't want them to have it. And, number three, you were concerned that the letter had—was a confidential student record and that if you

gave it to Tom Evans or the Board of Regents, you would be making it—you would be placing it at risk for public records request. Is that fair?" Mills: "That's generally fair. What I meant to say was I—I didn't sit down at that time and organize my thoughts in the way you've just done it to me. I didn't say there were three reasons that I didn't do this or cause this not to—that wasn't the way it was—that wasn't my thought process, that wasn't the way it was going on. Sitting here today after the fact, that far—that's a fair description of—more than—I would tell you I think I had more concerns that the family—I believe I had information given their actions and the information that Tom Evans, that they didn't want to, so I think it was more than concerns.").

22. Mills notes that he was not the custodian of the letter and that the letter was addressed to Mason and others, not to Mills. Pl.'s Fact Resp. ¶ 42.

23. Campbell was a member of the Board of Regents and was named to the advisory committee along with two other Regents, Robert Downer and Ruth Harkin. Pl.'s Fact Resp. ¶¶ 16–17. Campbell, due to her former capacity as Iowa Attorney General, was experienced in conducting investigations. *Id.* ¶ 18.

Mason made a statement apologizing for the failure to provide the letters. *Id.* ¶ 51.

On July 28, 2008, the Advisory Committee engaged the Stolar Partnership LLC ("Stolar") as "Special Counsel" to conduct an independent investigation. *Id.* ¶ 52. On the same date, the Iowa Attorney General obtained a court order permitting distribution of the EOD's report and related documents for use by Stolar in its investigation. *Id.* ¶ 53. On July 30, 2008, Evans wrote Mills a letter on behalf of the Board asking for copies of all documents from all relevant departments and staff regarding the University's investigation of the incident." *Id.* ¶ 54.

After conducting a number of interviews and a review of the University's policies and procedures, Stolar presented its report (the "Stolar Report" or the "Report") to the Board on September 18, 2008. *Id.* ¶ 55. The report was made public by the Board on the same date, and was published on the Board's website at approximately the same time. *Id.* ¶ 60. With regard to Mills' performance, Stolar did not find "any evidence of malicious attempts to conceal information or intentional wrongdoing," but nonetheless found that "Mills' responses to the incident were consistent with a culture of a lack of transparency at the University General Counsel's Office and likely contributed to allegations of a University cover-up." [24] *Id.* ¶ 56. The Report also concluded that "Mills' involvement in micromanaging the University's response to the incident presented a serious conflict of interest," stating:

> When the Department of Athletics completed its investigation and turned the investigation over to EOD on October 23, Fred Mims submitted the report to Mills, as well as to EOD. On the same day, Mills met with EOD officials as they decided how to conduct the formal

investigations. Mills also became the contact person for the Student Athlete and her family. Mills appears to have been the contact person for all parties involved in investigating the incident.

*Id.* ¶ 57. Regarding Mills' relationship with the Student Athlete's family, the Report found:

> Mills' failed communication with the Student Athlete's father was also detrimental to the University's relationship with the Student Athlete and her family. On or about October 24, according to the Student Athlete's father, Mills contacted him, "out of the blue" and told him that he was a liaison for the University. Mills' notes show he first contacted the Student Athlete's father at Betsy Altmaier's suggestion and remained in contact through November 13. Mills told the Student Athlete's father that from that point on, Mills would be the Student Athlete's family's contact for information on the investigation. The Student Athlete's father was deeply dissatisfied with Mills' performance as an informant on the progress of the investigation. He stated Mills was extremely difficult to reach and that each time he spoke to Mills about the investigation, he was "given a different story." . . . The Student Athlete's father is of the opinion that the entire situation "would have been better" if Mills had never contacted him.

*Id.* ¶ 58. As to Mills' failure to turn over the November 19, 2007 letter to Evans, the Report noted that Mills "expressly stated that he did not rely upon any statutory authority or the court order in his decision not to disclose the letter" and "admitted that he should have turned the letter over to Tom Evans, but that he 'figured the Regents would get it if they got it.'" *Id.*

---

24. Mills does not dispute *what* the Stolar Report says, but generally denies that the Re-

ports' conclusions are accurate. Pl.'s Fact Resp. ¶¶ 56–59.

¶ 59. Investigators also stated in the Report that it was "[e]specially perplexing" that "while Mills did not disclose the letter to Tom Evans, he hand-delivered copies of the November 19, 2007 letter to Department of Athletic officials on November 25." *Id.* The Report further noted that "[n]o response to the November 19, 2007 letter was provided by the University," and that "[o]nce again, the lack of transparency led to substantial difficulties for the University when the existence of the letter was disclosed to the media by the Student Athlete's parents on July 19, 2008."[25] *Id.*

On September 19, 2008, Mason asked Mills to meet him in her office and told him she was going to have to ask for his resignation. *Id.* ¶ 62. According to Mills, Mason told him in this meeting that the University would have some other job for him.[26] *Id.* On September 20, 2008, the Des Moines Register printed an editorial entitled, "First Step for Mason: Fire two top officials at University of Iowa." *Id.* ¶ 61. On September 21, 2008, Mills met with True,[27] who allegedly told Mills that "we are being told that we cannot keep you employed in any capacity."[28] *Id.* ¶ 63. On September 22, 2008, Mills informed Mason that, because the University would not employ him in any capacity, he was unwilling to resign and would provide Mason with his response to the Report the next day. Defs.' Resp. to Pl.'s Add'l Facts ¶ 33. In the morning on September 23, 2008, Mills sent Mason a ten-page, single-spaced rebuttal to the Stolar Report, with exhibits. Pl.'s Fact Resp. ¶¶ 64, 69. Mills' letter stated, among other things, that "[t]here are serious flaws in the Stolar Report, both in substance and in process and I believe those flaws must be identified and corrected in the record. My response, which is attached, corrects several of the inaccuracies relating to my role in the investigation of the incident." *Id.* ¶ 70. In the afternoon on September 23, 2008, Mason had a staff member present Mills with a letter informing him he was being terminated. *Id.* ¶ 65. Mason's letter stated that "[t]his action is the result of my loss of confidence and trust in you based

---

**25.** Mills points out that Mason testified that she did not believe Mills had a conflict of interest when he spoke with the Student Athlete's family and that Mason did not agree with the Report's conclusion that the General Counsel's office had a culture of lack of transparency. Defs.' Resp. to Pl.'s Add'l Facts ¶¶ 25–26. Mills also points out that Altmaier testified that there was not a lack of transparency in the General Counsel's office, that Mills did not micromanage the University's response to the sexual assault, that Mills did not lead the University's response, and that "the response of the General Counsel to the Stolar Report raised questions regarding the accuracy of the Stolar Report." *Id.* ¶¶ 27–30.

**26.** Mills also claims that Mason "gave him a hug and told him that she had never had to fire someone who had done nothing wrong." Defs.' Resp. to Pl.'s Add'l Facts ¶ 31.

**27.** True was a Senior Vice President and Treasurer of the University. Pl.'s Fact Resp. ¶¶ 19, 63.

**28.** According to Mills, Miles and Mason also discussed at some point in time whether Mills should continue in any form of employment with the University. Defs.' Resp. to Pl.'s Add'l Facts ¶ 40. Miles testified at deposition that he:

> asked [Mason] to contemplate and expressed my view that it seemed odd if indeed one had lost confidence in an individual that worked for them in a—I think—I can't think of a position that demands a degree of confidence and faith than one's counsel. If in fact this was the case on her part, I struggled to see where that—how that fit with offering another position where one would then have to have confidence in the individual and trust in their judgment. I had difficulty reconciling that and thought that she should think very hard about whether those positions were reconcilable or not.

Pl.'s Resistance App. at 83.

upon your failure to perform the duties and responsibilities of your position on behalf of the University of Iowa in response to the . . . 2007 sexual assault." [29] *Id.* ¶ 65.

On September 24, 2008, the Iowa City Press Citizen published an article entitled "Mason fires Mills and Jones." The article quoted Mason as stating, "I need complete confidence in my senior staff moving forward, and I no longer felt I had that with Marc Mills and Phil Jones." *Id.* ¶ 71. The article also quoted Mason as saying she was "disappointed, ashamed, embarrassed for how this case was handled . . . I was two-and-a-half months on the job. I trusted my senior advisors to be doing what was supposed to be done." *Id.* Mason further commented that she was "very disappointed when [she] learned how significantly some of my senior staff fell in terms of their responsibility." *Id.* The September 24, 2008 article also referenced Mills' rebuttal and reaction to his termination, stating:

> Mills said he did not think he should have been fired and said he wrote a 10–page detailed response contesting allegations against him, which he gave to Mason and the Iowa State Board of Regents on Tuesday morning. He was fired in the afternoon, he said. "I think

that I am being unfairly singled out, yes," Mills said. "I have serious fundamental disagreements with some aspects of the Stolar report, particularly with regards to my role in it. . . . Mills said he declined to resign because he thought he had acted properly. "I felt for my own personal integrity I would be unable and unwilling to resign without presenting my side of the story," Mills said. *Id.* ¶ 71; Defs.' J.A. at 313–15.

On September 24, 2008, the Des Moines Register published an article entitled, "Assault probe fallout: U of I fires 2." Pl.'s Fact Resp. ¶ 72. In this article, Mills is quoted as saying that he had been unfairly singled out by the Stolar report and that he had "handled the matter to the best of my ability under the circumstances." *Id.* The article also quoted Mills concerning specific criticisms of the Report. *Id.* Mason was further quoted as stating that she needed to be able to trust her senior advisors, that it was "very difficult to come to any other conclusion than I just don't have that with Marc Mills or Phil Jones," that she was "shocked" to learn of Mills' full role in the mishandling of the sexual abuse allegation, and that "to have an individual who was not working for the good of the

29. Mills points out that when he provided Mason with his rebuttal to the Report, he had no idea that "Mason had already signed a letter terminating Mills from employment with the University." Defs.' Resp. to Pl.'s Facts ¶ 34. Mason admitted in deposition that she signed the September 23, 2008 termination letter "before leaving [her] office that morning." Pl.'s Resistance App. at 59. Mason further testified, however, that she "recall[ed] on that morning getting a letter from [Mills] and I was prepared to send [the termination letter] and I held off sending it because I wanted to read that letter." *Id.* Indeed, in paragraph 35 of his Statement of Additional Material Facts, Mills contends that "Mason reviewed [his response to the Stolar Report] while she was being driven to Des Moines" and that "[w]ithin hours of receiving the re-

sponse from Mills, Mason had the letter of termination delivered to Mills." Defs.' Resp. to Pl.'s Add'l Facts ¶ 35. Mason's testimony is consistent with this, in that she states that before leaving her office, she had provided instructions that the signed termination letter "needed to be delivered [to Mills] if and when I called," and that she called to have the letter delivered "[l]ater in the day." Pl.'s Resistance App. at 59–60; *see id.* at 60 (Mason testifying that she reviewed Mills' rebuttal, and had a conversation with Mark Braun about going ahead with Mills' termination, conveying that she "appreciated what [Mills] was trying to lay out here in his letter," but "that it didn't change what had transpired or how this was being viewed, and that was unfortunate").

institution and keeping the big picture in mind is more upsetting than you can imagine." *Id.* ¶ 73. The article quotes Miles as stating that Mason has his absolute support and that he believed that Mason's actions would help rebuild trust in the University. Defs.' Resp. to Pl.'s Add'l Facts ¶ 39.

At a September 25, 2008 Board meeting, when Miles asked her for her response to the Stolar Report, Mason stated in part:

Failing a student who asks for our help is unacceptable. Failing to be transparent and accountable to the Board of Regents, and ultimately to the people of Iowa, is also unacceptable. . . .

I'm particularly grateful to the Board of Regents for commissioning an in-depth and impartial investigation of the University's policies, procedures, and actions with respect to the allegations of sexual assault made by a student athlete against other University athletes last fall. It's clear from the Stolar Group's report that most University officials followed our established procedures. However, it's also clear that those procedures are flawed, and that some University officials did not do all they could have done or should have done, even within those procedures, to ensure that the young woman was protected and supported by the University.

I took several steps this week aimed at restoring trust in the University of Iowa. I terminated the employment of Vice President for Student Services Phillip Jones and UI Counsel General Marc Mills on Tuesday, September 23.

Pl.'s Fact Resp. ¶ 67; Defs.' J.A. at 261. At the same meeting, Mason outlined various steps the University would take to change its policies and procedures with regard to handling sexual assaults in response to the criticisms of the Report and as directed by the Board. Pl.'s Fact Resp. ¶ 68.

On September 27, 2008, the Des Moines Register published an article entitled, "Fired lawyer offers rebuttal." Pl.'s Fact Resp. ¶ 74. The article described Mills' response to the Report at length and described the response of Stolar's investigator, James Bryant ("Bryant"). *Id.* While Bryant's response reiterated the Report's conclusions with regard to Mills' actions, Bryant also stated that "I think [Mills] was honest. That is why we didn't find that he had covered it up." *Id.*

On September 29, 2008, the Iowa City Press Citizen published a guest editorial that stated, "Until I see proof otherwise, [Jones and Mills] continue to have our full support, and I absolutely question the action of terminating their employment." *Id.* ¶ 75. The article further stated that "Jones and Mills devoted their careers to UI, are excellent people and held their current positions for many years. [They] know how to act given any current circumstances. I question how well the [Report] did to identify and understand the ever evolving variables at play throughout the . . . case." *Id.*

On September 30, 2008, the Iowa City Press Citizen ran an article entitled, "Ex–Education lawyer criticizes UI firings," wherein the general counsel for the American Council on Education stated that, "[h]aving read this sort of B-minus report over a second time, I fail to see what in that report . . . warrants their termination, if anything." *Id.* ¶ 76. He further stated that Jones' and Mills' firings "border on the extraordinary." *Id.*

On December 16, 2008, the Des Moines Register printed an article in which Campbell made statements with respect to Mills' involvement in the investigation of the Student Athlete's sexual assault. Defs.' Resp. to Pl.'s Add'l Facts ¶ 41. In particular, Campbell stated, "He wound up calling

every sho[t]" and "He took control of the case."[30] *Id.*

Following his termination, Mills applied for several employment positions with the University. *Id.* ¶ 45. By letter dated October 23, 2009, True notified Mills that he would not be considered for any employment position with the University and that Mills could request a review of the reasons for his disqualification. *Id.* Mills requested such a review by letter dated November 23, 2009, but did not receive a response. *Id.* ¶ 46. Mills contends that True testified in deposition that "he has declared no one else ineligible" and "does not know of anyone other than Mills who has been declared ineligible" for employment with the University of Iowa based upon the policies upon which he declared Marc Mills to be ineligible for employment.[31] Pl.'s Statement of Material Facts in Supp. of Mot. for Partial Summ. J. (Clerk's No. 72) ¶¶ 52–53. Mills contends that True "made public the declaration that Mills was ineligible for employment to at least five people, some of whom were in positions to offer Mills employment." *Id.* ¶ 54.[32] Mills believes that his termination and the fact that it was reported nationally has ad-

versely affected his ability to obtain employment in higher education anywhere in the United States. Defs.' Resp. to Pl.'s Add'l Facts ¶ 50. Mills also alleges that, despite his requests, he has been denied an opportunity for a name-clearing hearing. *Id.* ¶ 49.

## II. STANDARD OF REVIEW

The term "summary judgment" is something of a misnomer. *See* D. Brock Hornby, *Summary Judgment Without Illusions,* 13 Green Bag 2d 273 (Spring 2010). It "suggests a judicial process that is simple, abbreviated, and inexpensive," while in reality, the process is complicated, time-consuming, and expensive.[33] *Id.* at 273, 281. The complexity of the process, however, reflects the "complexity of law and life." *Id.* at 281. "Since the constitutional right to jury trial is at stake," judges must engage in a "paper-intensive and often tedious" process to "assiduously avoid deciding disputed facts or inferences" in a quest to determine whether a record contains genuine factual disputes that necessitate a trial. *Id.* at 281–82. Despite the seeming inaptness of the name, and the desire for some in the plaintiffs' bar to be rid of it, the summary judgment process is well-accepted and appears "here to stay."[34]

---

**30.** Campbell's only source of information in making her statements about Mills was the Stolar Report. Defs.' Resp. to Pl.'s Add'l Facts ¶ 44.

**31.** Defendants contend these facts are irrelevant, particularly considering that there has not been another individual who, like Mills, was terminated from employment with the University and who, simultaneous with an application for re-employment, was also maintaining a lawsuit against the University and against the Board of Regents. Defs.' Resp. to Pl.'s Statement of Material Facts in Supp. of Mot. for Partial Summ. J. (Clerk's No. 85–2) ¶¶ 52–53.

**32.** Save for the addition of paragraphs 52–54, Plaintiffs Statement of Material Facts in Support of His Motion for Partial Summary Judgment are identical to his Statement of Addi-

tional Material Facts provided in resistance to Defendants' Motions for Summary Judgment.

**33.** Indeed, Judge Hornby, a District Court judge for the District of Maine, convincingly suggests that the name "summary judgment" should be changed to "motion for judgment without trial." 13 Green Bag 2d at 284.

**34.** Judge Hornby notes that over seventy years of Supreme Court jurisprudence gives no hint that the summary judgment process is unconstitutional under the Seventh Amendment. *Id.* at 281 (citing *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 336, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) and *Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). While he recognizes that not much can be done to reduce the complexity of the summary judgment process, he nonetheless makes a strong case for im-

*Id.* at 281. Indeed, "judges are duty-bound to resolve legal disputes, no matter how close the call." *Id.* at 287.

Federal Rule of Civil Procedure 56(a) provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." "[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chem. Interchange Co.,* 541 F.2d 207, 209 (8th Cir. 1976) (citing *Windsor v. Bethesda Gen. Hosp.,* 523 F.2d 891, 893 n. 5 (8th Cir. 1975)). The purpose of summary judgment is not "to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broad. Sys., Inc.,* 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). Rather, it is designed to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried." *Anderson v. Viking Pump Div., Houdaille Indus., Inc.,* 545 F.2d 1127, 1129 (8th Cir.1976) (citing *Lyons v. Bd. of Educ.,* 523 F.2d 340, 347 (8th Cir.1975)). Summary judgment can be entered against a party if that party fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Federal Rule of Civil Procedure 56 mandates the entry of summary judgment upon motion after there has been adequate time for discovery. Summary judgment is appropriately granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and that the moving party is therefore entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (8th Cir.1994). The Court does not weigh the evidence, nor does it make credibility determinations. The Court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wilson v. Myers,* 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.") (citing *Weight Watchers of Quebec, Ltd. v. Weight Watchers Int'l, Inc.,* 398 F.Supp. 1047, 1055 (E.D.N.Y. 1975)).

In a summary judgment motion, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. If the moving party has carried its burden, the nonmoving party must then go beyond its original pleadings and designate specific facts showing that there remains a genuine issue of material fact that needs to be resolved by a trial. *See* Fed.R.Civ.P. 56(c). This additional showing can be by affidavits, depositions, answers to interrogatories, or the admissions on file. *Id.; Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257,

provements in it, including, amongst other things, improved terminology and expecta-

tions and increased pre-summary judgment court involvement. *See id.* at 283–88.

106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

Particularly in the presence of competing cross motions for summary judgment, a court must keep in mind that summary judgment is not a paper trial. Therefore, a "district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir.1994). In a motion for summary judgment, the Court's job is only to decide, based on the evidentiary record that accompanies the moving and resistance filings of the parties, whether there really is any material dispute of fact that still requires a trial. *See id.* (citing *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505 and 10 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2712 (3d ed. 1998)).

 Neither does filing cross motions for summary judgment mean the parties have waived their right to trial. *See Wermager v. Cormorant Twp. Bd.,* 716 F.2d 1211, 1214 (8th Cir.1983) ("[T]he filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits.") (citations omitted). Rather, for the purposes of summary judgment, a party concedes there are no factual issues and accepts the other party's allegations only for the purpose of their own motion. *See Federal Practice and Procedure* § 2720; *see also Metro. Life Ins. Co. v. Johnson,* 297 F.3d 558, 561–62 (7th Cir.2002) (reviewing the record with "all inferences in favor of the party against whom the motion under consideration is made") (citing *Hendricks–Robinson v. Excel Corp.,* 154 F.3d 685, 692 (7th Cir.1998)). "Cross motions simply require [a court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Barnes v. Fleet Nat'l Bank,* 370 F.3d 164, 170 (1st Cir.2004) (quoting *Wightman v. Springfield Terminal Ry.,* 100 F.3d 228, 230 (1st Cir.1996)). In this matter, then, each motion will be "evaluated independently to determine whether there exists a genuine dispute of material fact and whether the movant is entitled to judgment as a matter of law." *St. Luke's Methodist Hosp. v. Thompson,* 182 F.Supp.2d 765, 769 (N.D.Iowa 2001). Nevertheless, the Court is mindful that "[s]ummary judgments in favor of parties who have the burden of proof are rare, and rightly so." *Turner v. Ferguson,* 149 F.3d 821, 824 (8th Cir.1998).

## III. LAW AND ANALYSIS

Mills' Amended Complaint asserts the following counts against the Defendants: 1) Count I, against Mason, for violation of due process by denial of pre-termination hearing; 2) Count II, against Mason, for due process violation by denial of name-clearing hearing; 3) Count IV, against the State, for breach of contract; 4) Count V, against the State, for failure to pay wages; 5) Count VI, against Mason and Campbell, for violation of due process, and 6) Count VIII, against True, for violation of due process.[35] *See generally* Am. Compl.

35. In his Amended Complaint, Mills also asserts Count VI against Stolar and Bryant,

(Clerk's No. 35). Mason, Campbell, and True assert they are entitled to summary judgment on Counts I, II, VI, and VIII. *See* Clerk's No. 48. The State asserts it is entitled to summary judgment on Counts IV and V. *See* Clerk's No. 49. Mills asserts he is entitled to summary judgment on Counts II, VI, and VIII. *See* Clerk's No. 72. The Court will address each relevant Count of the Amended Complaint in turn.[36]

### A. Count I (Mason)—Due Process Violation for Failure to Grant a Pre-termination Hearing

Mason contends she is entitled to summary judgment on Count I of Mills' Amended Complaint because: 1) Mills was an at-will employee of the University who was not entitled to a pre-termination hearing; and 2) even if Mills were entitled to a pre-termination opportunity to be heard, he was granted such opportunity by submitting his detailed rebuttal of the Stolar Report to Mason.

#### 1. Was Mills an at-will employee?

■ In *Cleveland Board of Education v. Loudermill,* the United States Supreme Court held that an individual with a property right in continued employment could not be deprived of such right without due process of law. 470 U.S. 532, 538, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) ("Respondents' federal constitutional claim depends on their having had a property right in continued employment."). In Count I of

the Amended Complaint, Mills asserts that he "had a protected property interest in his employment with the University of Iowa," and that the University, through Mason, violated Mills' due process rights with respect to this protected property interest by "terminat[ing] Mills' employment without a pre-termination hearing." Am. Compl. ¶¶ 39–40.

■ "Property interests are not created by the Constitution, 'they are created and their dimension are defined by existing rules or understandings that stem from an independent source such as state law....'" *Loudermill,* 470 U.S. at 538, 105 S.Ct. 1487 (quoting *Bd. of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth,* 408 U.S. at 564, 92 S.Ct. 2701. "The sufficiency of the claim of entitlement must be decided by reference to state law." *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).

■ Iowa law provides that, "[a]bsent a valid contract of employment, an employment relationship is generally considered to be inherently indefinite and presumed to be at-will." *Fitzgerald v. Salsbury Chem., Inc.,* 613 N.W.2d 275, 280 (Iowa 2000). At-will employment "means the

along with two additional claims: 1) Count III for false light invasion of privacy and defamation; and 2) Count VII for interference with contract. These claims against Stolar and Bryant are the subject of a separate Motion for Summary Judgment. Hence, they will be considered in a separate order and will not be further discussed herein.

**36.** The parties generally agree that summary judgment in favor of either Mills or in favor of the individual Defendants (Mason, Campbell,

and True) is proper on Counts II, VI, and VIII. *See* Clerk's No. 85 ¶ 3. Indeed, Mills' Motion for Partial Summary Judgment and the Individual Defendants' Motion for Summary Judgment merely present opposite sides of precisely the same legal issue, i.e., whether Mills' due process rights were violated by the fact that the Individual Defendants did not grant him a name-clearing hearing. Accordingly, the Court will consider all three of these Counts together in its analysis.

employment relationship is terminable by either party 'at any time, for any reason, or no reason at all.' " *Id.* (quoting *Phipps v. IASD Health Servs. Corp.,* 558 N.W.2d 198, 202 (Iowa 1997)); *Hunter v. Bd. of Trustees,* 481 N.W.2d 510, 513 (Iowa 1992). Thus, if the Court finds that Mills had a valid contract that warranted Mills in expecting continued employment, his due process claim for failure to grant a pre-termination hearing may arguably proceed. If, on the other hand, the Court finds Mills to be an at-will employee of the University, his claim in Count I fails as a matter of law.

Here, Mills contends that he had a protected property interest in continued employment with the University because Skorton's July 28, 2005 offer of employment states, "It is my intention that you would serve for an initial term of not less than five years." Pl.'s Br. in Resistance to State's Mot. for Summ. J. (Clerk's No. 64–1) at 11–12 ("Pl.'s Iowa Resistance Br."); Pl.'s Br. in Resistance to Individual Defs.' Mot. for Summ. J. (Clerk's No. 65–1) at 11–12 ("Pl.'s Resistance Br."). Plaintiff points out that, in response to Skorton's July 26, 2005 offer, Mills and Skorton spoke about some of Mills' concerns,[37] and Skorton revised the July 26 offer to include an increased salary and the quoted language expressing Skorton's "intent" that Mills serve as General Counsel for a period of five years. Pl.'s Iowa Resistance Br. at 11. Mills accepted the revised offer dated July 28, 2005 and has since stated that it was his own "understanding, expectation, and intent that this new, additional language gave me an initial term of employment of General Counsel of five years." Pl.'s Resistance App. at 42 (Mills Aff. ¶ 2). Mills also points out that the "intent that Mills serve a five-year term as General Counsel was approved by the

Board of Regents." Pl.'s Resistance Br. at 12. Mills argues that this Court must "give effect to the intention of the parties" in interpreting the July 28, 2005 letter and, thus, must read it to include an entitlement by Mills to a five-year term of employment. *Id.* at 11 (citing *First Nat'l Bank in Creston v. Smith,* 331 N.W.2d 120, 122 (Iowa 1983)); *id.* at 12 ("The undisputed facts demonstrate that the intent of President Skorton, the Board of Regents and Mills was that Mills serve an initial term of employment as General Counsel for five years, and Mills, therefore, was not an employee at will.").

■■■ Mills is correct that, "[i]n construing a written contract, the intent of the parties controls." *Kerndt v. Rolling Hills Nat'l Bank,* 558 N.W.2d 410, 416 (Iowa 1997). What Mills does not acknowledge, however, is the equally fundamental principle of contract law that, "except in cases of ambiguity, the parties' intent is determined by what the contract itself says." *Id.* Moreover, "[a] contract must be interpreted as a whole" and "an interpretation which gives a reasonable meaning to all terms is preferred to one which renders a term superfluous or of no effect." *Id.* (citing *Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents,* 471 N.W.2d 859, 862–63 (Iowa 1991)).

■■■ Here, Skorton's July 28, 2005 revised offer letter explicitly states:

In accordance with long-standing University policy, *this position is classified as "at will" status.* The administrative, policy-making and other responsibilities of this position *required* this designation. This is consistent with other upper-level executives at the University. *This designation means that you serve at the will of the institution and are not guar-*

---

**37.** In particular, Mills states in his Affidavit that he "had concerns that [he] was giving up

a position that had career status protections." Pl.'s Resistance App. at 41.

*anteed a specific term of appointment.* It is my intention that you would serve for an initial term of not less than five years.

Defs.' J.A. at 221 (emphasis added). Acceptance of Mills' asserted position, that the final sentence of this paragraph entitled him to a five-year term of employment, would unquestionably leave the preceding four sentences without any meaning or effect. On the other hand, it seems Mills would argue that giving meaning to first four sentences leaves the final sentence without any meaning or effect. The mere fact, however, that the parties interpret this paragraph in different ways, or would opt to give some portions of the paragraph more weight than other portions, does not necessitate a finding that the paragraph is ambiguous, such that there remains a question of interpretation for a jury to resolve.

■ A contractual term will be found ambiguous only if, "after all pertinent rules of interpretation have been considered," "a genuine uncertainty exists concerning which of two *reasonable* interpretations is proper." *Hartig Drug Co. v. Hartig,* 602 N.W.2d 794, 797 (Iowa 1999) (emphasis added). Here, the Court simply cannot conclude that Mills' interpretation of the July 28, 2005 letter—as warranting him in an expectation of continued employment for five years—is reasonable.

First, accepting Mills' position would require the Court to render null the language preceding Mills' favored sentence, which clearly and explicitly states that the position "is classified as 'at will,'" that the responsibilities of the position "required this designation," and that the designation means that Mills would "serve at the will of the institution" and was "not guaranteed a specific term of appointment." Defs.' J.A. at 221. There is absolutely nothing ambiguous or vague about these terms. Indeed, in countless cases arising under Iowa law, courts have relied on such language to conclude that the employer had explicitly disclaimed any expectation of continued employment by the employee, i.e., to find that the employee was merely an "at-will" employee. *See, e.g., Anderson v. Douglas & Lomason Co.,* 540 N.W.2d 277, 288 (Iowa 1995) (finding that no unilateral contract of employment could exist, and that employee had no property interest in continued employment, where employee handbook explicitly disclaiming an intent to create "any" contractual rights); *see id.* (discussing other similar cases).

Second, Skorton's language identifying his "intention" that Mills "would serve for an initial term of not less than five years" does nothing to discount the language preceding it and does not, therefore, create an ambiguity. Skorton does not promise or guarantee Mills a term of employment for five years. Rather, he merely states his personal intention that Mills "would" serve for that period of time. When taken out of isolation and read in conjunction with the rest of the July 28, 2005 letter, the Court simply cannot find that any reasonable person could interpret Skorton's "intent" language as giving rise to a reasonable expectation by Mills in a contractually guaranteed five-year term of employment.

■ Third, despite Mills' arguments to the contrary, Mills conceded in his deposition that he was an "at will" employee of the University, albeit with an "expectation" of a five-year term of employment:

Q. And as an at-will employee, you served at [Mason's] pleasure and discretion, correct?

A. With the terms of—

Q. With the caveat—

A. of my employment with the five-year expectation, yes.

Q. With the caveat of whatever arises or doesn't arise from your revised offer letter that we talked about?

A. Correct, correct.

Defs.' J.A. at 154. As the *Roth* Court stated, however, a property interest arises because an individual has a "legitimate *entitlement* to it," not because he has "a unilateral *expectation* of it." *Roth,* 408 U.S. at 564, 92 S.Ct. 2701 (emphasis added).

Lastly, to the extent that Mills argues that the Board of Regents "approved" a five-year term of service, his claim is without any evidentiary support. Section 4.05 of the Board's Operating Policy provides that "[p]rovosts, vice presidents, and directors of major units and comparable positions at the special schools shall be nominated by the institutional head for appointment by the Board." Defs.' Joint Supp.App. (Clerk's Nos. 82–2, 83–2) at 26. Nothing in the Board's minutes on the date of Mills' appointment, however, says anything about a five-year term of employment. *See id.* at 15 (August 3–4, 2005 Board Agenda stating "action requested" on the "appointment" of "MARC MILLS as General Counsel effective August 1, 2005, at an annual salary of $197,000"), 20 (consent agenda indicating that "Institutional Personnel Transactions" were authorized as part of a "Consent Agenda"). Mills' claim that his "expectation and intent that he have a five-year term of employment should prevail because the State had 'reason to suppose' that Mills understood his employment contract to have a five-year term" is also without merit. Pl.'s Resistance Br. at 12. Though Mills cites Iowa Code § 622.22,[38] he provides no case law or argument whatsoever supporting its applicability to the present situation. Finally, Mills claim that the language in the revised July 28, 2005 letter should be construed against the drafter of the language, i.e., the University, also fails. As the Court previously stated, it does not believe the language of the July 28, 2005 letter is "fairly susceptible to two interpretations." *See Iowa Fuel,* 471 N.W.2d at 863. Thus, there is no ambiguity to construe against the drafter. *See id.* ("When a contract is not ambiguous, it will be enforced as written, but when there are ambiguities in a contract, they are strictly construed against the drafter.").

For these reasons, the Court concludes that there is no genuine issue of material fact on the question of Plaintiff's employment status with the University. He was an at-will employee. Accordingly, his claim under Count I must fail because, absent a legitimate property interest in continued employment, Mills cannot have been deprived of due process by any failure of the University to provide a pre-termination hearing. *See, e.g., Hogue v. Clinton,* 791 F.2d 1318, 1324–25 (8th Cir. 1986) (finding that an at-will employee with a "unilateral expectation of continued employment" was not entitled to due process protection prior to termination).

2. *Sufficiency of pre-termination review.*

 Even assuming Mills was not an at-will employee, the Court would nonetheless grant summary judgment in favor of Mason on Count I. *Loudermill* held that "[a]n essential principle of due process is that a deprivation of life, liberty, or property, 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" 470 U.S. at 542, 105 S.Ct. 1487 (quoting *Mullane v. Central Hanover*

---

**38.** Iowa Code § 622.22 provides: "When the terms of an agreement have been intended in a different sense by the parties to it, that sense is to prevail against either party in which a party had reason to suppose the other understood it."

*Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). "We have described 'the root requirement' of the Due Process Clause as being 'that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest.'" *Id.* (quoting *Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971)). "This principle requires' some kind of a hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment." *Id.* (quoting *Roth,* 408 U.S. at 569–70, 92 S.Ct. 2701).

In the present case, Mason requested Mills' resignation on September 19, 2008, based upon the findings of the Stolar Report. Pl.'s Fact Resp. ¶ 62. Mills declined to resign and instead submitted to Mason a ten-page, single-spaced itemization and rebuttal to the perceived inaccuracies in the Report. *Id.* ¶ 64. Although Mason had already signed a termination letter regarding Mills at the time she read Mills' rebuttal, there is no dispute that Mason read the rebuttal and considered it prior to directing the delivery of the termination letter to Mills. *See supra* n. 28. Thus, *prior* to his termination, Mills was notified of his impending termination, the reasons therefore, and was provided an opportunity to present his side of the story. The constitutional requirements of due process are satisfied in such circumstances. *See Loudermill,* 470 U.S. at 542, 105 S.Ct. 1487 ("For example, in *Arnett* [*v. Kennedy,* 416 U.S. 134, 167, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974)] six Justices found constitutional minima satisfied where the employee had access to the material upon which the charge was based and could respond orally and in writing and present rebuttal affidavits."); *Winskowski v. City of Stephen,* 442 F.3d 1107, 1110 (8th Cir. 2006) ("Consistent with *Loudermill,* this Court has held that a pre-termination hearing 'need not be elaborate.' To the contrary, all that is required is that the employee have 'notice of the charges . . . , an explanation of the employer's evidence, and an opportunity for the employee to present his side of the story.' Thus, for instance, an 'informal meeting with supervisors' may constitute a sufficient pretermination hearing." (internal citations omitted)).[39]

**B. *Count IV (State)—Breach of Contract***

Mills alleges in Count IV of his Amended Complaint that he "was employed under a written contract with the University, dated July 28, 2005," that the contract "provides for an initial term of employment for five years," and that the "termination of Mills' employment with the University on September 23, 2008 was a breach of the contract." Am Compl. ¶¶ 61–62.

For reasons discussed extensively in *supra* § III(A)(1), the Court finds that Mills was an at-will employee and, thus, did not have a written contract with the University that guaranteed or entitled him to a five-year term of employment. Accordingly, summary judgment is proper in favor of the State on Mills' breach of contract claim.

**C. *Count V (State)—Failure to Pay Wages***

Mills alleges in Count V of his Amended Complaint that he was entitled to "at least

**39.** It is noteworthy that Mills' resistance briefs offer no argument or authority opposing Defendants' claims that Mills was provided all the process that was due him by virtue of his rebuttal to the Stolar report. Mills' failure to resist this argument by Defendants also warrants the entry of summary judgment in favor of Mason on Count I. *See* LR 56(b)(1) (requiring a party resisting summary judgment to file a brief "in which the resisting party responds to each of the grounds asserted in the motion for summary judgment").

three months notice prior to termination," that he "was not provided three months notice as provided by the University of Iowa Policies, nor was he paid three months salary in lieu of notice," and that this failure by the University "constitutes an intentional failure to pay wages due Mills, in violation of Iowa Code Section 91A.8." Am. Compl. ¶¶ 63–66.

■■■ The Iowa Wage Payment Collection Law provides that "[w]hen the employment of an employee is ... terminated, the employer shall pay all wages earned, less any lawful deductions specified in section 91A.5 by the employee up to the time of the ... termination not later than the next regular payday for the pay period in which the wages were earned." Iowa Code § 91A.4. The term "wages," is defined in § 91A.2 as "compensation owed by an employer for: (a) labor or services rendered by an employee ... [and] (b) [v]acation, holiday, sick leave, and severance payments which are due an employee under ... a policy of the employer." The Iowa Supreme Court has made clear that an employer will only be liable under the Iowa Wage Payment Collection Law if the wages are actually "owe[d]" to the employee pursuant to the employer's policies. *See Phipps,* 558 N.W.2d at 202.

■■■ The policy that Mills contends entitles him to three months notice or three months pay in lieu of notice comes from the *University of Iowa Operations Manual,* ¶ 3. 1(h). This provision provides in pertinent part:

Terminations for other than cause.

(1) Staff members in probationary or term status who are terminated prior to the end of the probationary period or term for reasons other than causes relating to the staff member's lack of satisfactory performance or University-related conduct (e.g., funding, reorganization in the project, department, college, or University) will receive no-

tice in accordance with the following schedule:

(a) One month notice during the first year of employment;

(b) Three months notice thereafter.

. . . .

(2) At-will employees who are terminated for reasons other than causes relating to performance or University-related conduct shall receive the same notice period described above.

Defs.' J.A. at 228.

The State argues that Mills was not "owed" notice or salary in lieu of notice because the plain language of the University policy provides that three months notice is only required when an employee is terminated "for reasons other than causes relating to performance." State's Br. in Supp. of Summ. J. (Clerk's No. 49–1) at 17–18. According to the State:

Mills cannot dispute that this case is entirely about his performance as General Counsel. The crux of the dispute in this case is whether Mills performed appropriately during the investigation of the October 14, 2007 sexual assault incident. The Stolar Report was highly critical of Mills' performance for a number of reasons. In addition, President Mason specifically stated in her letter terminating Mills' employment that "[t]his action is the result of my loss of confidence and trust in you based upon your failure to perform the duties and responsibilities of your position on behalf of the University of Iowa in response to the ... 2007 sexual assault." Mills in his deposition made it clear that his performance was being challenged by the Stolar Report. He further testified that when he first read the Stolar Report "I'm fairly confident that I would have skimmed through it and focused on the parts that focused on my office and *my performance.*" In addition Mills ex-

pressly acknowledged that the purpose of his personal rebuttal to the Stolar Report was to summarize his position that he had performed his "duties and responsibilities adequately and well."

*Id.* at 18–19 (internal citations omitted).

In resistance to the State's Motion for Summary Judgment on Count V, Mills points out: 1) that when "Mason told him he was being removed as General Counsel, she also said that she had never before fired someone who had done nothing wrong"; 2) Altmaier testified that "Mason told her that the Regents were forcing her to fire Mills, and if she did not fire Mills and Phillip Jones, she may be fired"; 3) "Altmaier testified that the Stolar Report was wrong with respect to its assessment of Mills' performance"; 4) "Altmaier testified that there was not a lack of transparency in the General Counsel's office"; 5) "Altmaier testified that contrary to the conclusion reached by Stolar, Mills did not micromanage the University's response to the sexual assault"; 6) "Altmaier also testified that contrary to the conclusion of Stolar, Mills did not lead the University's response to the sexual assault"; 7) "Altmaier testified that [Mills'] Response to the Stolar report had merit and demonstrated the incorrect conclusions published in the Stolar Report"; and 8) Mills' response to Stolar Report "demonstrated the inaccuracies of each of the conclusions reached by the Stolar Report that were critical of the General Counsel's Office." Pl.'s Iowa Resistance Br. at 13–14. According to Mills, all of these factors preclude summary judgment in favor of the State because they demonstrate that there are genuine issues of material fact regarding whether Mills was, in fact, terminated for "causes relating to performance." *Id.* at 12–13.

The Court does not find Mills' resistance persuasive. The University policy at issue provides merely that an employee is entitled to three months notice when he is "terminated for reasons other than causes *relating* to performance or University-related conduct."[40] Defs.' J.A. at 228 (emphasis added). Even assuming that all of Mills' and Altmaier's criticisms of the Stolar Report are correct, and even assuming that Mason actually told Mills that she "had never had to fire someone who had done nothing wrong," these facts simply cannot obviate a conclusion that Mills was terminated for the role he played in the University's response to the October 14, 2007 incident, i.e., for a reason, right or wrong, "relating to" his performance or University-related conduct. Indeed, the Court does not believe a reasonable jury could conclude that Mills' termination was *not* "relat[ed] to" his performance or University-related conduct. Accordingly, the State is entitled to summary judgment on this claim.

D. *Count II (Mason)—Due Process Violation; Count VI (Mason and Campbell)—Due Process Violation; Count VIII (True)—Due Process Violation*

In Count II of his Amended Complaint, Mills alleges that Mason violated his due process rights by "wrongfully terminating his employment, damaging his reputation by publishing false statements about Mills, and denying Mills a name-clearing hearing as requested by Mills." Am. Compl. ¶ 46. Mills contends that, by "wrongfully branding [him] as operating with a conflict of interest and with improperly managing the sexual abuse investigation, Mason has stigmatized Mills and created significant obstacles for Mills to obtain future employment." *Id.* ¶ 48. In Count VI of the

---

**40.** The term *related* is not defined by the University's policy. The dictionary, however, defines the term as "connected or having relation to something else." Oxford English Dictionary (3d ed. Dec. 2009).

Amended Complaint, Mills asserts that Mason and Campbell violated his due process rights when they made stigmatizing false allegations against him "that attacked his good name, reputation, honor and integrity and which resulted in his discharge from employment." *Id.* ¶ 68. Mills points out that he "requested a name-clearing hearing and Mason denied Mills the right to a name-clearing hearing." *Id.* ¶ 71. In Count VIII of the Amended Complaint, Mills alleges that True "informed Mills that ... the University of Iowa will not consider Mills as a candidate for employment because Mills was terminated ... and because Mills has filed claims based on his termination." *Id.* ¶ 81. Mills alleges that "True has informed other employees of the University that Mills is disqualified from employment with the University," and that True refused to respond to Mills' request for an explanation as to why he was disqualified. *Id.* ¶¶ 81–83. According to Mills, True's "deprivation of Mills' due process rights has caused substantial harm to him by creating substantial obstacles to his future employment and making it difficult for Mills to escape the stigma of the disqualification from employment with the University." *Id.* ¶ 84.

■ An "employee is entitled to procedural due process only when he has been deprived of a constitutionally protected ... liberty interest." *Winegar v. Des Moines Indep. Cmty. Sch. Dist.*, 20 F.3d 895, 899 (8th Cir.1994). "An employee's liberty interests are implicated where the employer levels accusations at the employee that are so damaging as to make it difficult or impossible for the employee to escape the stigma of those charges." *Id.; see also Shands v. City of Kennett*, 993 F.2d 1337, 1347 (8th Cir.1993) ("To establish protected liberty interests, plaintiffs [are] required to establish that a [government] official, in connection with discharging plaintiffs, publically made allegedly untrue charges against them that would stigma-

tize them so as to seriously damage their standings and associations in their community, or foreclose their freedom to take advantage of other employment opportunities.").

■ "An unconstitutional deprivation may occur when an employee is not given an opportunity to clear his or her name." *Rush v. Perryman*, 579 F.3d 908, 912 (8th Cir.2009) (citing *Stodghill v. Wellston Sch. Dist.*, 512 F.3d 472, 476 (8th Cir.2008)). "To establish an unconstitutional liberty interest deprivation, the plaintiff must establish that: (1) he was stigmatized by the statements; (2) those statements were made public by the administrators; and (3) he denied the stigmatizing statements." *Id.* at 913.

1. *Was Mills stigmatized by the statements of Mason, Campbell, or True?*

Mills contends that each of the three individually named Defendants made stigmatizing statements about him, that such statements were made publically, and that Mills denied the stigmatizing statements. Pl.'s Br. in Supp. of Mot. for Partial Summ. J. (Clerk's No. 72–1) at 11 ("Pl.'s Br."); Pl.'s Resistance Br. at 12–13. Defendants deny that any statement by any of the Individual Defendants was sufficiently stigmatizing to implicate Mills' liberty interests. Defs.' Br. at 24, 33, 37–38; Defs.' Resistance to Pl.'s Mot. for Partial Summ. J. (Clerk's No. 85) at 3–5 ("Defs.' Resistance Br."). For purposes of determining if a liberty interest is implicated by a particular statement, "[t]he requisite stigma has generally been found when an employer has accused an employee of dishonesty, immorality, criminality, racism, and the like." *Winegar*, 20 F.3d at 899.

a. *Mason.*

■ It appears that Mills is relying on the following statements by or attributable

to Mason as being sufficiently stigmatizing to implicate his liberty interests: [41]

* Mason's September 24, 2008 statement wherein Mason stated: 1) she was "shocked" to learn the full role of Mills in the University's investigation; 2) "To have an individual who was not working for the good of the institution and keeping the big picture in mind is more upsetting that you can imagine"; 3) "I just don't have that [trust] with Marc Mills"; 4) she hoped Mills' firing would rebuild trust in the University.

Am. Compl. ¶ 54; Pl.'s Facts ¶ 37; Pl.'s Reply in Supp. of Mot. for Partial Summ. J. at 1–2 ("Pl.'s Reply").[42] According to Mills, these statements by Mason are false and stigmatized him because "they indicate that Mills led the University's response to the sexual assault, mishandled the University's response to the sexual assault, was not working for the good of the University of Iowa, was not trustworthy, and that his firing would in some way rebuild trust in the University of Iowa." Pl.'s Facts ¶ 38; *see also* Pl.'s Br. at 11 ("These public

comments are sufficiently stigmatizing to a University General Counsel's reputation, honor and good name in the community to implicate liberty interests."); Pl.'s Reply at 1–2 ("These statements publicly question the honesty, credibility and trustworthiness of Marc Mills and damage his good name. The statements are direct accusations that Mills[ ] had not acted with honorable, upright and fair intentions. That these statements questioned Mills' honesty is demonstrated by Mason's testimony that she fired Mills because he had little or no credibility with the Board of Regents."). Mills further claims that Mason's statements "brand[ed him] as operating with a conflict of interest and with improperly managing the sexual abuse investigation"). Am. Compl. ¶ 48.

Mason counters that the statements Mills identifies are simply not sufficiently stigmatizing to implicate Mills' liberty interests. Notwithstanding Mills' arguments to the contrary, the Court must agree. Nothing about Mason's comments inherently implies that Mills was dishonest, immoral, criminal, racist, or the like.

**41.** It has been somewhat difficult for the Court to discern precisely what statements Mills is relying on in support of his claims against the Individual Defendants. Indeed, in his brief in resistance to Defendants' Motion for Summary Judgment and in his brief in support of his own Motion for Partial Summary Judgment, Mills never *specifically* identifies the statements by Mason that are allegedly stigmatizing. *See* Pl.'s Resistance Br. at 13 ("Mills has set forth facts demonstrating that he was terminated for such reasons as an alleged conflict of interest, allegedly operating the General counsel's office with a culture of a lack of transparency, and allegedly being unworthy of trust."); Pl.'s Br. at 11 ("Mills has set forth facts to which there is no genuine issue for trial that demonstrate that he was terminated from employment for such reasons as an alleged conflict of interest, allegedly mishandling the University's response to the sexual assault, allegedly not working for the good of the University, allegedly operating the General Counsel's office with a cul-

ture of a lack of transparency, allegedly failing to turn over documents relevant to the Evans Report when asked, and allegedly being unworthy of trust."). Rather, it appears that the relevant statements are predominantly identified in Plaintiff's Statement of Material Facts (Clerk's No. 72–2) and in Count III of the Amended Complaint, which notably is one of the Counts asserted only against Stolar and Bryant.

**42.** Although Mills does not specifically recite it, the Court will assume that Mills also would claim as actionable Mason's statements in the September 24, 2008, Iowa City Press Citizen article, wherein she referenced a lack of confidence in Mills, her "disappoint[ment], [shame], [and] embarrass[ment] for how this case was handled," and her "disappoint[ment] when [she] learned how significantly some of [her] senior staff fell in terms of their responsibility." *See* Pl.'s Fact Resp. ¶ 71.

*See Winegar*, 20 F.3d at 899. Indeed, the Court believes, at best, Mason's comments can be construed as implying that Mills' performance was unsatisfactory, that Mills exercised poor judgment, that Mills failed to meet professional standards, that Mills engaged in general misconduct, or that Mills was incompetent. Such allegations have repeatedly been rejected by the Eighth Circuit and other courts as being sufficiently stigmatizing to implicate an individual's liberty interest. *See Stodghill*, 512 F.3d at 476–77 ("[A]llegations about ... job performance do not rise to an actionable level." (quotation marks and citation omitted)); *Buchholz v. Aldaya*, 210 F.3d 862, 866 (8th Cir.2000) (" '[A] plaintiff is not deprived of her liberty interest when the employer has alleged merely improper or inadequate performance, incompetence, neglect of duty or malfeasance.' ") (quoting *Ludwig v. Bd. of Trustees of Ferris State Univ.*, 123 F.3d 404, 410 (6th Cir.1997)); *Mascho v. Gee*, 24 F.3d 1037, 1039 (8th Cir.1994) ("Unsatisfactory performance or general misconduct are insufficient to create a stigma that implicates an employee's liberty interest in his reputation." (citation omitted)); *Green v. St. Louis Housing Auth.*, 911 F.2d 65, 69 (8th Cir.1990) ("Falsely charging an employee with unsatisfactory job performance ... does not infringe his liberty interest, because it does not 'carry with it the sort of opprobrium sufficient to constitute a deprivation of liberty.... [W]e must discriminate between a dismissal for dishonesty, for having committed a serious felony, for manifest racism, for serious mental illness, or for lack of intellectual ability, as distinguished from [ ] performance.... The former characteristics imply an inherent or at least a persistent personal condition, which both the general public and a potential

future employer are likely to want to avoid [whereas the latter] suggests a situation rather than an intrinsic difficulty; as part of one's biography it invites inquiry, not prejudgment.' " (quoting *Harrison v. Bowen*, 815 F.2d 1505, 1518 (D.C.Cir.1987) (some quotations marks and citations omitted)); *Norbeck v. Davenport Cmty. Sch. Dist.*, 545 F.2d 63, 69 (8th Cir.1976) (finding that an allegation that an employee was operating under a "conflict of interest" amounted to a charge of "poor judgment and not dishonesty" and, as such, was "basically equivalent to a statement alleging that [the employee's] conduct failed to meet professional standards. Such a statement does not impinge upon a liberty interest."). Moreover, Mills has not identified any circumstances that would give rise to a conclusion that Mason's lack of "trust" in Mills stemmed from any dishonesty or immorality by him.[43] *See Anderson v. Low Rent Housing Comm.'n of Muscatine*, 304 N.W.2d 239, 244 (Iowa 1981) (finding no stigma where employer specifically stated the employee had lost the employer's "confidence, respect, and trust" in performing the duties of the employee's position). Accordingly, the Court finds summary judgment in favor of Mason on Counts II and VI appropriate because her statements were not so stigmatizing as to implicate Mills' liberty interests.

b. *Campbell.*

▇▇▇ It appears that Mills is relying on the following statements by or attributable to Campbell as being sufficiently stigmatizing to implicate his liberty interests:

* Campbell's December 16, 2008 statement wherein she stated that Mills

---

**43.** Plaintiff has not identified anything in the Stolar Report that directly impugns Mills' honesty or morality. Indeed, the author of the Report even stated publically, "I think [Mills] was honest. That is why we didn't find that he had covered it up." Pl.'s Fact Resp. ¶ 74.

"wound up calling every shot" and "took control of the case."

Am. Compl. ¶ 55; Pl.'s Facts ¶ 41. According to Mills, these statements are false because investigation of the sexual assault incident was not within the scope of his responsibilities as General Counsel, because Mason did not direct Mills to manage the investigations, and because Mills merely provided legal advice regarding the incident to the University and answered procedural questions from the Student Athlete's father. Pl.'s Facts ¶¶ 41–43. Mills asserts that Campbell's statements "effectively and inaccurately shifted responsibility to Mills for all the mistakes made during the investigation of the assault, including the damaging allegations of conflict of interest and improper withholding of information from the Board of Regents." Pl.'s Reply at 3; *see also* Pl.'s Br. at 11 ("These public comments are sufficiently stigmatizing to a University General Counsel's reputation, honor and good name in the community to implicate liberty interests.").

The Court does not believe that Campbell's statements that Mills "took control" and "wound up calling every shot" are sufficiently stigmatizing to implicate Mills' liberty interests. Even assuming that Campbell's statements necessarily imply that the deficiencies in the Stolar Report were Mills' responsibility, such statements, at best, impugn Mills' job performance and judgment. As such, they are not actionable pursuant to the case law cited in *supra* § III(D)(1)(a).

### c. True.

It appears that Mills is claiming that True stigmatized him and, thus, violated his liberty interests because True "informed Mills" that the University would "not consider Mills as a candidate for employment because Mills was terminated ... and because Mills has filed claims based on his termination." Am. Compl. ¶ 81. Mills may additionally be relying on his assertion that True "informed other employees at the University that Mills is disqualified from employment with the University." *Id.*; *see also* Pl.'s Br. at 12 ("Mills has set forth facts to which there is no genuine issue for trial that demonstrate he has been stigmatized by the declaration of ineligibility for employment with the University of Iowa contained in the True letter dated October 23, 2009. Being banned from consideration for employment in any position with the University ... after having served the University for 17 years severely damages Mills' good name, reputation, honor and integrity.").

The Court cannot find that True's statement that Plaintiff was ineligible for employment with the University due to the fact that he had been terminated and filed suit rises to the level of an actionable due process claim. Nothing in True's statements implies dishonesty, immorality, criminality, racism, or the like by Mills. Indeed, to the extent that True's statement even arguably implies that the deficiencies in the Stolar Report were Mills' responsibility, such statements, at best, impugn Mills' job performance and judgment. As such, they are not actionable pursuant to the case law cited in *supra* § III(D)(1)(a).[44]

---

44. Mills cites *Roth* in support of his claim against True. *See* Pl.'s Br. at 13; Pl.'s Reply at 4. In *Roth,* a non-tenured professor was declined a second term of employment and claimed a procedural due process violation because "University officials [failed] to give him notice of any reason for nonretention and an opportunity for hearing." 408 U.S. at 568–69, 92 S.Ct. 2701. Recognizing that there "might be cases in which a State refused to re-employ a person under such circumstances that interests in liberty would be implicated," the Supreme Court found *Roth* was "not such a case." *Id.* at 573, 92 S.Ct. 2701. In particular, the Court found that the State, "in declining to rehire the respondent, did not make any charge against him that

2. *Was Mills' right to a name-clearing hearing in the circumstances of this case clearly established?*

██ Even assuming that any particular statement by the Individual Defendants was sufficiently stigmatizing so as to implicate Mills' liberty interests, the Court would still find summary judgment in favor of the Individual Defendants proper on the basis of qualified immunity. To succeed on his due process claims against the Individual Defendants, Mills must prove, beyond the stigmatization element, that "the right the official is alleged to have violated [was] 'clearly established,'" i.e., that the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 639–40, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The "salient question" is whether, at the time they made the allegedly offending statements, "the state of the law ... gave [Mason, Campbell, and True] fair warning that [Mills'] alleged treatment was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 731, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

In the circumstances of this case, Plaintiff merely argues that the law prohibiting stigmatizing statements was well-established at the time of Defendants' offending statements and that a name-clearing hearing is required under such circumstances. *See, e.g.*, Pl.'s Reply at 4–5. Plaintiff, however, has not identified a single case that is factually apposite to the circumstances presented here, nor has he demonstrated that Defendants publically stated or opined about anything that was not discussed in the results of the independent investigation by Stolar. Under these circumstances, Mason, Campbell, and True could not reasonably have been expected to know that their comments regarding Plaintiff, based on the Stolar Report, and that did not directly impugn Plaintiff's honesty, morality, criminality, or the like, were actionable under 42 U.S.C. § 1983.[45]

3. *Was Mills given an adequate opportunity to clear his name?*

██ Defendants argue that, even if Mason's, Campbell's, and True's statements were sufficiently stigmatizing to implicate Mills' liberty interests, and even if they are not entitled to qualified immunity, Mills' due process claims in Counts II, VI, and VIII still cannot survive because Mills had "a sufficient and adequate opportunity to be heard on the statements giving rise to the alleged stigma, which is all that is constitutionally required." Defs.' Br. at 28. In particular, Defendants point out that Mills availed himself of a number of opportunities to clear his name. *Id.* at 29. First, he sent Mason a detailed, ten-page response to the Stolar Report. *Id.* Mills acknowledged in deposition that his response was circulated relatively broadly and was discussed by various media out-

---

might seriously damage his standings and associations in the community. It did not base the nonrenewal of his contract on a charge, for example, that he had been guilty of dishonesty, or immorality." *Id.* Although the University in the present case deemed Mills ineligible for any other positions with the University, the fact remains that nothing in this statement of ineligibility is "so damaging as to make it difficult or impossible for [Mills] to escape the stigma of those charges." *Winegar*, 20 F.3d at 899.

**45.** The Individual Defendants also make a rather compelling argument, founded on *Ersek v. Twp. of Springfield*, 102 F.3d 79 (3d Cir.1996), that the statements made by Mason, Campbell, and True were opinions based on the Stolar Report, that the statements were incapable of being refuted, and thus, that a name-clearing hearing would be futile and is not required. *See, e.g.*, Defs.' Br. at 26–28. Because the Court finds ample basis to reject Plaintiff's claims on other grounds, it will not opine of Defendants' arguments in this regard.

lets. Defs.' J.A. at 153. Second, Mills was quoted extensively in the September 24, 2008 Iowa City Press Citizen article, stating that he "contested the allegations," "declined to resign because he thought he had acted properly," and "felt for my own personal integrity I would be unable and unwilling to resign without presenting my side of the story." Defs.' Br. at 28; Defs.' J.A. at 314–15. Third, Mills was quoted in a September 24, 2008 Des Moines Register article as saying he had been "unfairly singled out in the Stolar report" and as stating, "I believe I handled the matter to the best of my ability under the circumstances." *Id.* at 317–18. The Des Moines Register article further recounted:

> Mills disagreed with the Stolar report's assessment of his actions. He said he did not have a conflict of interest in acting as U of I general counsel and serving as a liaison with the alleged victim's family.
>
> Mills said investigators did not allow him to give his version of six phone conversations he had with the alleged victim's father.
>
> He also disagreed with the law firm's assessment that he should have asked a judge to permit the U of I to release documents pertaining to the report.
>
> "I'm disappointed that the president and the regents didn't have an opportunity to get a fuller review," Mills said.
>
> He said he gave Mason his response to the report Tuesday morning and learned via letter that afternoon that he had been fired.

*Id.* at 318.

Mills counters Defendants' argument by pointing out that the "fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Pl.'s Resistance Br. at 18 (citing *Winegar,* 20 F.3d at 899). He contends that the distribution of his response to the Stolar Report was insuffi-

cient as a name-clearing hearing because the document's publication did "not provide Mills with the opportunity to refute the false allegations against him in a meaningful forum that could effectively clear his name. It did not allow Mills to present his case and have its merits fairly judged." *Id.* at 17. Mills further argues that the newspaper articles did not provide him "an opportunity to be heard at a meaningful time and in a meaningful manner, and [did] not provide Mills with an adequate opportunity to clear his name." *Id.* at 18 (citing *Winegar,* 20 F.3d at 899 and *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).

While Defendants' argument has certain appeal, the Court declines to find at this juncture that Mills' pre-termination response to the Stolar Report and his comments to various newspaper outlets satisfied *Defendants' obligation,* if such an obligation existed, to provide him with a post-termination name-clearing hearing. Due process requires "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews,* 424 U.S. at 333, 96 S.Ct. 893 (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)). On the factual record and arguments before it, the Court simply cannot conclude as a matter of law that mere publicity of Mills' position, unrelated to any action by Defendants, is sufficient to satisfy the due process requirements of a name-clearing hearing. Nonetheless, for the reasons stated *supra,* in §§ III(D)(1)-(2), summary judgment in favor of Defendants remains proper.

## IV. CONCLUSION

For the reasons discussed herein, the Motion for Summary Judgment filed by Mason, Campbell, and True (Clerk's No. 48) is GRANTED; the State of Iowa's

Motion for Summary Judgment (Clerks' No. 49) is GRANTED; and Mills' Motion for Partial Summary Judgment (Clerk's No. 72) is DENIED.

IT IS SO ORDERED